IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| EHOUSE DEVELOPMENT LLC, a Washington limited liability company, | No. 84406-7-I |
| Appellant, | DIVISION ONE |
| v. | |
| SANFORD LAM, an individual, | UNPUBLISHED OPINION |
| Respondent. | |

SMITH, C.J. — The feasibility contingency of a real estate purchase and sale agreement between Ehouse Development LLC and Sanford Lam terminated the agreement unless Ehouse timely gave notice of its satisfaction with the property. Ehouse did not provide that notice, but it did make a required $200,000 payment after the contingency would have terminated the contract, and it spent the next three years acting as though still bound by the contract. It did not close the purchase at the end of that three year period, as the agreement required, and instead sued seeking the payment's return.

The trial court ruled in Lam's favor and we affirm. The trial court's factual findings about the intent of the parties support its conclusion that they modified the impact of the feasibility contingency through addenda entered into at the same time as the contract, meaning the contract remained in effect. Ehouse's alternative theory of recovery—unjust enrichment—is consequently unavailing since unjust enrichment exists only in the absence of a governing contract.

Finally, the trial court did not err in requiring Ehouse to prove its breach of contract claim by a preponderance of the evidence even in the face of what Lam characterized as an "affirmative defense." Defendants bear the burden to prove affirmative defenses but, despite its denomination, Lam was only contesting an element of Ehouse's breach claim, he was not making an affirmative defense.

FACTS

Ehouse Development LLC, a company governed and managed by its sole member, Wei Yang, sought to purchase a property in Bellevue, Washington owned by Sanford Lam. Lam operated a restaurant on the property, which was otherwise mainly vacant land. Negotiations about the terms of the purchase began in 2016. Only on June 6, 2017, however, did mutual acceptance occur when Lam agreed to Ehouse's fifth offer. The terms of the resulting real estate purchase and sale agreement (PSA) figure heavily in this case.

It is uncontested that under the terms of the agreement Ehouse agreed to pay Lam two million dollars for the property. It is also uncontested that Ehouse agreed to give Lam $200,000 before the final closing as an initial payment. But the character of this payment is slightly unclear. As a part of addenda and edits made to the previously filled out PSA form, the parties removed many—though far from all—references to "earnest money," replacing them with "non-refundable deposit." The addenda were signed on the same day as the PSA, June 6, 2017, and were explicitly incorporated into the PSA. The final addendum indicates that the deposit is due "30 days after mutual acceptance" of the contract.

The portion of the contract that became one of the main subjects of contention at trial, and now on appeal, is the "feasibility contingency." This provision conditions Ehouse's obligations under the agreement on its satisfaction with the state of the property, including its physical condition, its potential financial benefits to Ehouse, its feasibility for Ehouse's intended purpose, and the availability of government permits and approvals. To aid Ehouse's determination of its satisfaction, a subsection of the contingency required Lam to "make available for inspection by" Ehouse a diverse selection of relevant documents in his possession. The contingency directs: "This agreement shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives written notice to Seller within 5 days . . . (the 'Feasibility Period') of Mutual Acceptance stating that this condition is satisfied." Absent the contingency terminating the PSA, Ehouse would have three years to close the sale of the property, during which time Lam would not be able to seek other buyers.

At trial, the parties contested the extent to which Ehouse took advantage of its rights under the PSA to inspect the property and the degree to which Lam responded to those requests. Yang testified that she met with Lam during the feasibility period and asked for vendor contracts and other financial documents, but that Lam denied having any and offered to "cook the books." However, she admitted that she was not prohibited access to the property and that Lam may not have possessed the documents she requested, saying "he didn't have anything." Lam flatly denied Yang's testimony that he had offered to "cook the books." He admitted not turning over the requested documents, but explained

3

his inability to do so as a function of the small size of the business: he did not have maintenance records, vendor contracts, leases with tenants, or other requested documents because the business was simply too small to have ever required them. And he countered that he provided what documents he did possess, including proof of property ownership, payment of taxes, his business license, financial statements, and utility bills. The parties submitted no evidence other than their oral testimony about either Yang's requests or Lam's responses.

Regardless, Ehouse never provided notice of its satisfaction, nor otherwise took any action concerning the feasibility contingency. This was not, however, the end of the parties' interactions. Ehouse made its $200,000 payment to Lam. It did so 34 days after the feasibility period expired, after first requesting an extension of time. It then sought other investors, pursued permitting, and worked with a designer to draw renditions of possible redevelopment. In all respects, Ehouse appears to have acted as though still bound by the PSA, and particularly by the addenda to the PSA.

But Ehouse did not close the purchase by the last day of the contract's life, June 6, 2020. And Lam did not return the $200,000 payment he had received from Ehouse.

Ehouse sued pleading claims under breach of contract and unjust enrichment theories, requesting the return of the $200,000 payment. After a bench trial, the court found for Lam. It determined that the parties had, through their addenda and edits to the PSA at the time of signing, altered the feasibility contingency such that Ehouse's failure to give notice of satisfaction did not

4

automatically terminate the contract.  It also rejected Ehouse's unjust enrichment claim and issued a declaratory judgment affirming Lam's right to retain the payment under the terms of the PSA.

Ehouse appeals.

ANALYSIS

Standard of Review

We review "a trial court's decision following a bench trial by asking whether substantial evidence supports the trial court's findings of fact and whether those findings support the trial court's conclusions of law." Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). "Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true." Firgrove Commons, 183 Wn. App. at 712.  We do not disturb the trial court's findings about the credibility of witnesses. Garza v. Perry, 25 Wn. App. 2d 433, 453, 523 P.3d 822 (2023).  A trial court's oral rulings may be considered when interpreting written findings of fact and conclusions of law so long as there is no inconsistency. City of Lakewood v. Pierce County, 144 Wn.2d 118, 127, 30 P.3d 446 (2001). Erroneously denominated findings of fact or conclusions of law will be reviewed for what they are, not for what they are labeled.[1]  Robel v. Roundup Corp., 148

---

[1] This rule is of particular relevance here.  The trial court's written findings of fact and conclusions of law, though nominally separate, are in fact frequently interspersed and mislabeled.  For instance, conclusion of law 11 contains mainly findings: "After expiration of the feasibility contingency, and for the next 3 years, the evidence showed that Ehouse's intent was to purchase the Property. Additionally, at trial, Ms. Yang admitted that Ehouse's intent was to purchase the property."

Wn.2d 35, 42, 59 P.3d 611 (2002). And a trial court's legal conclusions are reviewed de novo. Firgrove Commons, 183 Wn. App. at 712.

Central to this appeal, the standard of review when engaging in contract interpretation depends on the nature of the evidence relied on. When analysis " 'depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence,' " determination of the intent behind the contract is for the trier of fact. RESTATEMENT (SECOND) OF CONTRACTS § 212 (Am. L. 1981); Berg v. Hudesman, 115 Wn.2d 657, 667-68, 801 P.2d 222 (1990) (quoting RESTATEMENT § 212). It is otherwise a question of law. RESTATEMENT § 212(d).

### Effect of the Feasibility Contingency

This case revolves around the effect of the PSA's feasibility contingency. Ehouse asserts that the contingency operated by its own force to terminate the PSA when Ehouse had not given Lam notice of its satisfaction within five days after mutual acceptance. Ehouse then asserts that it was owed the return of its

---

This confusion is not merely semantic, but substantively impacts procedure on appeal. Ehouse's assignments of error name a number of conclusions of law and one finding of fact. Ehouse acknowledges that an erroneous denomination of a finding or conclusion does not require the appellate court to apply an inapt standard of review. But Ehouse does not attempt to untangle which of these findings and conclusions are inappropriately labelled, and does not explicitly apply a substantial evidence analysis to a "conclusion of law" even where that standard would be appropriate. Lam attempts to take advantage of this to assert that the remaining findings are verities on appeal because they are unchallenged. Indeed, Ehouse does not apply the substantial evidence standard to any issue, and arguably waives any challenges to factual findings as a result.

Regardless, this opinion applies substantial evidence review where actual findings of fact are clearly at issue in light of the parties' briefing.

6

$200,000 payment to Lam under terms of the contingency, which requires the return of any "earnest money" payment if notice is not given. We disagree.

The trial court was correct that the addenda and edits to the PSA contradict a strict reading of the contingency and its findings to that effect are supported by substantial evidence. This is so because the evidence reflects that the parties moved away from an "earnest money" model, replacing that form of payment with a "non-refundable deposit" due at a much later date. Because of the way in which earnest money interacted with the terms of the feasibility contingency, the trial court's findings about the parties' intent, ascertained by looking at their conduct as well as the PSA's written language, guide our interpretation of the contract. As a result, the PSA did not terminate when Ehouse failed to notify Lam of its satisfaction with the property.

### 1. Principles of Contract Interpretation

" 'The cardinal rule with which all [contract] interpretation begins is that its purpose is to ascertain the intention of the parties.' " Berg, 115 Wn.2d at 663 (quoting Arthur L. Corbin, The Interpretation of Words and the Parol Evidence Rule, 50 CORNELL L. QUAR. 161, 162 (1965)). Washington courts follow the "objective manifestation" theory of contract interpretation, meaning that they ascertain the intent of parties by focusing on "objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Words in a contract are given "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary

7

intent." Hearst, 154 Wn.2d at 504. And courts "do not interpret what was intended to be written but what was written." Hearst, 154 Wn.2d at 504.

Courts have developed many interpretive principles to ascertain the intent of the parties and the meaning of contractual terms. For instance, "[a]n interpretation of a writing which gives effect to all of its provisions is favored over one which renders some of the language meaningless or ineffective." Wagner v. Wagner, 95 Wn.2d 94, 101, 621 P.2d 1279 (1980). And courts aim to give contracts "a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or forced construction that leads to an absurd conclusion." Wash. Pub. Util. Dists.' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam County, 112 Wn.2d 1, 11, 771 P.2d 701 (1989). Importantly, these maxims are not absolute, but instead " 'are to be taken as suggestive working rules only. . . . They will be harmful if they are taken as dogmatic directions that must be followed, or if they mislead us into thinking that language has only one meaning, the one absolutely correct.' " Berg, 115 Wn.2d at 664-65 (alteration in original) (quoting 3 A. CORBIN, Contracts § 535, at 21 (1960)).[2]

---

[2] This permissive, circumstantial approach to the use of interpretive maxims is opposed by Ehouse, which contends that "[a] written contract *must* be interpreted to give effect to all of its provisions." (Emphasis added.) We reject this inflexible approach. Though some formulations of the maxim are phrased as imperatives, longtime practice and precedent from the Washington State Supreme Court indicates that it, like other interpretive maxims, is contextually applied where appropriate. See, e.g., Safeco Ins. Co. of Am. v. McManemy, 72 Wn.2d 211, 213, 432 P.2d 537 (1967) ("In construing a contract, each part, *if possible*, should be so construed that all parts thereof shall have some effect." (emphasis added)).

Because intent is the keystone of contract interpretation, courts look beyond a contract's written words when interpreting them. The Restatement (Second) of Contracts § 212 states that "[t]he interpretation of a [contract] is directed to the meaning of the terms of the writing . . . in the light of the circumstances." Thus—in contrast to statutory interpretation analysis—contract interpretation considers extrinsic evidence even where the words of the contract are unambiguous. Berg, 115 Wn.2d at 668 (citing RESTATEMENT § 212, cmt. b).

The extrinsic evidence considered by the courts is not limited to conduct over a certain period of time. The Restatement (Second) of Contracts § 214, which Washington follows, states that " "[a]greements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . the meaning of the writing.' " Berg, 115 Wn.2d at 667-68 (alternations in original) (quoting RESTATEMENT § 214 (c)). Similarly, "[i]n discerning the parties' intent, subsequent conduct of the contracting parties may be of aid, and the reasonableness of the parties' respective interpretations may also be a factor." Berg, 115 Wn.2d at 668. The use of extrinsic evidence is, however, limited in other ways. It may not be used for the purposes of showing an intention independent of the contract, nor in a way that would vary, contradict, or modify the written word. Hollis v. Garwall, Inc., 137 Wn.2d 683, 695, 974 P.2d 836 (1999).

2. The Feasibility Contingency

Here, the feasibility contingency does not easily coexist with provisions included in addenda to the PSA. The feasibility contingency grants Ehouse

discretion to decide whether the property meets its satisfaction.  It goes on to say that

> [t]his Agreement shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives written notice to Seller within 5 days . . . (the "Feasibility Period") of Mutual Acceptance stating that this condition is satisfied.

The form PSA used by the parties indicates that the feasibility period is 30 days long by default, but the parties' handwritten alterations instead first provided for zero days, then crossed that out and replaced it with five.  Lam testified that this was because

> when they presented the offer for me, they said zero days because the buyer already know what they want to do with the property. They mentioned no need of feasibility at the time.  And the last meeting, they put in the five days—they just—they wanted to make the—the contracts more—look like more regular, normal.
>
> So they put—written five days.  But, actually, they don't—they only do the study for months.  They know what they want to do, and there's no concern with the feasibility with them already.

In itself, though, the feasibility contingency is clear and unambiguous: it indicates that unless Ehouse gave Lam written notice of satisfaction within five days after the contract was signed, the contract terminated without any further action from the parties.  Ehouse did not timely provide written notice of its satisfaction within five days of the parties' mutual acceptance of the PSA on June 6, 2017.

But alterations made to the contract before signing and addenda enacted alongside the PSA muddy the parties' intent as it concerns this provision.  The feasibility contingency contemplates the "return" of "earnest money" if notice of satisfaction is not given.  "Earnest money" is typically a refundable deposit made at the start of a sale.  See, e.g., Haynes v. John Davis & Co., 22 Wn.2d 474, 475,

156 P.2d 659 (1945). But the "earnest money" provision contained in the PSA itself was clearly the result of considerable negotiation, and the edits and addenda to the PSA contradict the assumption of refundability. In the contract's section on the earnest money provision, for instance, the parties replaced the phrase "earnest money" with "non refundable cash deposit." And rather than tying the payment's timing to the date of mutual acceptance, the feasibility period, or their previously contemplated option—a promissory note paid two days after mutual acceptance—they instead referred to certain "CBA Addendum sheets:"



All four of the referenced addenda bear either the logo or name of the Commercial Bankers Association, abbreviated "CBA," in their upper right hand corners.[3] The last addendum concerns the payment of the non-refundable deposit that apparently replaced a traditional earnest money payment in the parties' contemplation. It indicates that "30 days after mutual acceptance buyer will deposit a non refundable cash deposit of $200,000 into an account of the seller's choosing." The addendum goes on to say, in a handwritten modification

---

[3] There are four addenda. The first is simply titled "Addendum/ Amendment to Purchase and Sale Agreement." The second is the "Financing Addendum." The third is the "Utility Charges Addendum." The fourth is again simply named "Addendum/Amendment to Purchase and Sale Agreement."

initialed by both parties: "This contract expires on month 36 from mutual acceptance date."

The impression that emerges—from the PSA and its addenda alone—is that the proposed payment schedule and quantity of "earnest money," and its refundability, changed dramatically toward the end of negotiations. In addition, the parties struck a previously filled out page of the PSA titled "earnest money promissory note." Despite this, references to earnest money were not diligently removed from the PSA; the phrase remains in over a dozen places—including, as seen, in the feasibility contingency—and is sometimes still referred to as refundable by the unaltered form language.

The parties' intent concerning the feasibility contingency—and its corresponding meaning—is therefore placed in question by the addenda and the last-minute edits to related terms. The contingency assumes that earnest money exists to be returned. This assumption was made sense when that payment would have been made within two days of mutual acceptance, and therefore within the five-day feasibility period itself. But once the terms of the earnest money payment were changed, the possibility of any payment's return was directly contradicted by its new designation as nonrefundable, as well as by the possibility that it would be made up to 25 days *after* the end of the feasibility period.

The trial court resolved the lack of clarity concerning the interaction of the edits, addenda, earnest money provision, and feasibility contingency by looking to extrinsic evidence of the parties' conduct to determine their objective intent. It

determined that "[p]ursuant to the second Addendum to the PSA, the feasibility contingency . . . was materially modified and rendered inapplicable by requiring Ehouse to tender a $200,000.00 non-refundable cash deposit to Mr. Lam, thirty days after mutual acceptance." It further found that "[a]fter expiration of the feasibility contingency, and for the next 3 years, the evidence showed that Ehouse's intent was to purchase the Property." And in its oral ruling, the court found that Ehouse "expressed [its] intent, even prior to the expiration [of the feasibility period] by signing that addendum." Because the contract's interpretation "depends on . . . choice among reasonable inferences to be drawn from extrinsic evidence," intent is a matter of fact we review for substantial evidence. RESTATEMENT § 212.

The trial court's findings about intent are supported by substantial evidence. Beyond the PSA's provisions themselves, evidence at trial was limited to the brief testimony of Yang and Lam. Yang testified that her intention after the five day feasibility period had expired was to continue to try to purchase the property.[4] Presumably pursuing that goal, Ehouse paid the nonrefundable deposit 34 days after the feasibility period would have expired, after first requesting an extension of time to find partner investors, and did not request the deposit's return. That Ehouse gave no notice but still made the payment is, alone, indication that the parties did not intend the feasibility contingency to

---

[4] This admission arguably goes only to Yang's and Ehouse's subjective intent. But it assists in understanding objective manifestations of intent through her conduct in the following three years.

remain effective after they enacted the edits and addenda.[5] Notably, the timeline of Ehouse's payment meets the addenda's expectation of a 30-day payment window. After making the payment, Ehouse hired a designer to draw renderings of a possible development. And it pursued building permits. But Ehouse was unable to obtain permits by the May 20, 2019 deadline, and so failed to close the purchase by June 6, 2020.

Lam, meanwhile, testified that Ehouse never asked to inspect the property during the feasibility period, nor in the following three years. He represented that it never complained about feasibility issues, and did not assert that he had failed to fulfil the terms of the contract. He confirmed that Ehouse had pursued permitting and design after the feasibility period had passed. He reported that Ehouse would occasionally bring potential investors to the property. And it appears from Lam's statements that Ehouse never asked for the return of their initial payment at any time before initiating this lawsuit.

The trial court therefore did not err when it concluded that the addenda altered the terms of the contingency. Its interpretation of the contract is a matter of fact, and its findings are supported by substantial evidence. As a result, Ehouse's failure to give notice of its satisfaction with the property did not

---

[5] Ehouse points to Yang's testimony that she was not familiar with the terms of the feasibility contingency beyond its requirement to make an earnest money deposit. But the trial court orally found this testimony "simply not credible" given Yang's experience with commercial transactions—she owns a number of commercial real estate business. The court's finding is supported by substantial evidence both for that reason and in light of Lam's above-quoted testimony about the drafting history of the feasibility contingency, which indicates that Yang affirmatively acted to alter the length of the feasibility period, the exact provision she now professes ignorance of.

terminate the PSA. Lam consequently had no obligation to return the $200,000 payment.[6]

Unjust Enrichment

We reject Ehouse's alternative argument that "[i]f the trial court's ruling is not reversed in favor of Ehouse's breach of contract claim, the Judgment could alternatively be reversed on the ground that the denial of Ehouse's unjust enrichment claim was in error." Unjust enrichment cannot serve as the basis for recovery where the parties' actions are governed by a contract. And even if the feasibility contingency had terminated the contract, substantial evidence supports that Lam would not have been unjustly enriched by keeping Ehouse's $200,000 payment.

---

[6] The trial court said in passing at its oral ruling that though the language of the feasibility contingency is not applicable, the legal impact of the addenda could alternatively be considered "waiver" of Ehouse's rights under the feasibility contingency. The written findings and conclusions echo this alternative approach. Because Ehouse focuses heavily on references to waiver—as did argument made throughout proceedings below and in front of this panel—we briefly address it.

Ehouse is correct that the addenda cannot reasonably be interpreted as waiver. A party to a contract may waive a provision meant for its benefit. Mike M. Johnson, Inc. v. County of Spokane, 150 Wn.2d 375, 386, 78 P.3d 161 (2003). Wavier can be implied. Johnson, 150 Wn.2d at 386. But waiver must require unequivocal acts evincing the intent to waive the right. Johnson, 150 Wn.2d at 386. Ehouse rightly maintains that courts cannot consider conduct that occurred after the termination of a contract when deciding whether a party waived its rights under a provision that—if not waived—was the cause of the termination. Mid-Town Ltd. P'ship v. Preston, 69 Wn. App. 227, 233-34, 848 P.2d 1268 (1993). This makes sense. Pre-termination acts potentially constituting waiver can hardly be "unequivocal" if a court has to look at the parties' subsequent conduct to determine whether waiver actually occurred. And it harmonizes with common sense and the general principles of waiver: a party cannot, through its conduct, waive a right it no longer has. Nor does it make much sense to say that a party can waive a right at the same time as it creates it, instead of holding that it simply never created the right in the first place.

15

An unjust enrichment claim allows "recovery for the value of [a] benefit retained absent any contractual relationship because notions of fairness and justice require it." Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008). Ehouse's unjust enrichment claim is premised on the idea that Lam unjustly retained its $200,000 payment. But that payment is governed by the terms of a contractual relationship, the PSA, which we have already determined did not terminate. The trial court therefore properly dismissed Ehouse's unjust enrichment claim.

Even if no contractual relationship governed this payment, though, Ehouse's challenge would be unavailing. To prove unjust enrichment, the claim's proponent must show (1) that the defendant received a benefit, (2) that benefit came at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment. Young, 164 Wn.2d at 484-85. The trial court determined that "Ehouse failed to produce evidence to support its claim for unjust enrichment." This is an overstatement, though it would be accurate to say that Ehouse failed to produce *sufficient* evidence. If, after all, the feasibility contingency had terminated the contract, Ehouse's payment would have conferred a clear benefit on Lam that certainly came at Ehouse's expense.

However, substantial evidence supports that circumstances would not have made it unjust for Lam to retain the payment. The parties thoroughly negotiated the payments' terms and decided that the $200,000 nonrefundable deposit was appropriate compensation for Lam's agreement not to sell his property for a three year term. During this time, Ehouse could freely pursue

16

investment to close its purchase without fear that another buyer would intervene. Regardless of whether the contract itself continued to bind the parties, Ehouse received the benefit it had bargained for and enjoyed a three-year period in which Lam did not sell the property. It used this time exactly as it would have under the contract: to pursue investors and plan redevelopment.

As a result, Ehouse failed to prove an essential element of its unjust enrichment claim. Thus, even if our interpretation of the feasibility contingency were that it had terminated the contract, substantial evidence would support the trial court's finding that Lam would not have been unjustly enriched.[7]

Burden of Proof on Ehouse's Contract Breach Claim

Ehouse asserted that Lam breached his obligations under the contract because he refused to make certain documents available for inspection during the feasibility period and because he did not return Ehouse's earnest money deposit. Lam, in his answer to Ehouse's complaint, pleaded as an "affirmative defense" that he had performed under the contract's terms and, as such, could not be liable for breach. The trial court found that "Ehouse did not meet its burden of proof that Mr. Lam failed to perform in accordance" with the PSA. On

---

[7] Ehouse's final assignment of error contends that "[t]he trial court erroneously granted declaratory relief in favor of Lam." The trial court granted Lam's request for declaratory judgment, affirming his right to retain the $200,000 payment he had received from Ehouse. Its assignment receives no corresponding briefing or citation to legal authority, however. See RAP 10.3(a)(6) (appellant's brief should contain argument and legal citation supporting issues); Regan v. McLachlan, 163 Wn. App. 171, 178, 257 P.3d 1122 (2011) ("We will not address issues raised without proper citation to legal authority."). Not only do we not need to address it as a result, but the terms of the PSA repeatedly emphasize the "non-refundability" of this deposit. The assignment is therefore neither properly presented nor substantively supportable.

appeal, Ehouse asserts that the trial court erroneously placed the burden of proof on Ehouse to show Lam's failure to perform, rather than placing the burden on Lam to demonstrate that he did. Ehouse is incorrect.

To recover on a breach of contract claim, the plaintiff must prove that a valid agreement existed between the parties, the defendant breached the agreement, and the plaintiff was thereby damaged. Lehrer v. Dep't of Soc. & Health Servs., 101 Wn. App. 509, 516, 5 P.3d 722 (2000). In civil cases, the burden of proof is a preponderance of the evidence, which requires establishing the relevant facts as "more likely than not, or more than 50 percent." Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 608, 260 P.3d 857 (2011).

The burden of proof changes where the defendant has pleaded an affirmative defense. The defendant bears the burden to prove their affirmative defense. August v. U.S. Bancorp, 146 Wn. App. 328, 343, 190 P.3d 86 (2008). But not any defense or theory at trial is an affirmative defense. Rather, the phrase is a term of art referring to a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, *even if all the allegations in the complaint are true*." BLACK'S LAW DICTIONARY 528 (11th ed. 2019) (emphasis added). One classic example of an affirmative defense is res judicata, which defeats a plaintiff's claims not by engaging with them on their merits but instead by showing that the factual dispute has already been decided by another tribunal and cannot be retried as a result. Jumamil v. Lakeside Casino, LLC, 179 Wn. App. 665, 680, 319 P.3d 868 (2014). Similarly, a defendant's assertion that a claim is barred by the statute of limitations is an

18

affirmative defense; it does not engage with the elements of the claim, but instead offers new propositions for the factfinder's consideration. Fulle v. Boulevard Excavating, Inc., 20 Wn. App. 741, 743, 582 P.2d 566 (1978).

We review claims that the trial court applied an erroneous burden of proof de novo. Home Builders Ass'n of Kitsap County v. City of Bainbridge Island, 137 Wn. App. 338, 345, 153 P.3d 231 (2007).

Here, Ehouse's argument fails because Lam's trial strategy was not truly an affirmative defense, despite being labeled as one in his answer to Ehouse's complaint. Instead, by asserting that he had fully performed under the terms of the contract, Lam sought to rebut one of the essential elements of Ehouse's breach of contract claim: that Lam had breached the contract. Lam was not relying on facts or law other than those relevant solely to Ehouse's claim, and so was not making an affirmative defense. Ehouse attempts to frame the rule here as a burden shifting one, allowing Ehouse to establish a prima facie case of breach before the burden moves to Lam to prove his affirmative defense of performance. But that is simply not the law. As a result, the court did not misapply the burden of proof and we reject this argument.[8]

---

[8] To the extent that Ehouse is attempting to challenge the substantiality of the evidence supporting the trial court's findings that Lam provided the documents he had in his possession to Ehouse, we decline to engage. At no point does Ehouse frame its issue as a challenge to the trial court's findings, despite many references to testimony and a tenor of argument indicating an attempt to reweigh evidence.

19

<u>Attorney Fees</u>

The PSA contains an attorney fee provision entitling the prevailing party in any related litigation to attorney to fees and costs. We can award fees and costs based on this provision so long as the receiving party properly requested fees. RAP 18.1(a)-(b). Lam made such a request and, since we decide in his favor, prevailed in this appeal. We therefore award him fees on appeal.[9]

We affirm.

_Smith, C.J._

WE CONCUR:

_Mann, J._        _Dwyer, J._

---

[9] The trial court awarded fees and costs to Lam after trial on the same contractual basis. Ehouse argues that the trial court's fee award should be reversed, but only in the event that we otherwise reverse the judgment. Because we do not reverse, we do not review the basis or amount of the fee award below.